IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

HERBERT T. ROBERTSON, SR.,
       Plaintiff,

v.                                     Civil Action No. 3:18-cv-371-JAG

THE SCHOOL BOARD OF THE
CITY OF RICHMOND, VIRGINIA, et al.,
       Defendants.

## OPINION

Herbert T. Robertson, Sr., works as a teacher's assistant at Mary Scott Preschool Center in Richmond Public Schools ("RPS").[1]  When a parent reported that Robertson came to work smelling like alcohol, an RPS security officer drove him to a local hospital for alcohol and drug testing.  In this § 1983 action, Robertson contends that the defendants[2] lacked reasonable, individualized suspicion to test him for drugs.  He argues that the defendants unreasonably searched and seized him in violation of the Fourth Amendment.  He also seeks to impose municipal liability on RPS for the alleged unlawful search and seizure.  Finally, Robertson asserts claims under state law for false imprisonment and defamation.  The parties have filed cross-motions for summary judgment.

Because Robertson cannot show that any seizure occurred, the Court will grant summary judgment for all defendants with respect to the seizure claims and the state law false imprisonment claim.  The state law defamation claim fails for independent reasons.  The drug test, however, amounts to an unreasonable search in violation of the Fourth Amendment.

---

[1] Robertson has sued The School Board of the City of Richmond, Virginia, which operates RPS. The Court will refer to the School Board as "RPS."

[2] In addition to RPS, Robertson has sued the Regional Preschool Manager for RPS, Johnnye Massenburg-Johnson, and two RPS security officers, Lieutenant Dandridge Hawkes and Lieutenant Patricia White.

Although qualified immunity shields the individual defendants from liability for the drug test, RPS is not entitled to judgment as a matter of law with respect to municipal liability for the unlawful search. Accordingly, the Court will deny the parties' cross-motions for summary judgment with respect to RPS' liability for the drug test.

## I. BACKGROUND

On November 6, 2017, a parent told Sonata Koger, an administrative assistant at Mary Scott, that Robertson was "drunk or smell[ed] like he [had been] drinking." (Dk. No. 19, at 13:1-9.) Koger also saw Robertson stumbling while interacting with students. Following the parent's report and her observation of Robertson, Koger called Johnnye Massenburg-Johnson, the Regional Preschool Manager.

Massenburg-Johnson called the RPS safety and security team, who in turn contacted Timothy Williams in human resources. Williams learned about the parent's report to Koger and Koger's observation of Robertson. Based on that information, Williams determined that reasonable suspicion existed to test Robertson for alcohol and drugs. Williams then told Massenburg-Johnson to go to Mary Scott to read Robertson the RPS Drug and Alcohol Free Workplace Policy (the "Policy") and have him sign it. Meanwhile, an RPS dispatcher told RPS security officer Dandridge Hawkes to report to Mary Scott to take Robertson to a local hospital for alcohol and drug testing.

When Hawkes arrived at Mary Scott, Koger called Robertson to the front office, where he met Hawkes and a second RPS security officer, Patricia White.[3] Hawkes told Robertson to wait in the administrator's office for Massenburg-Johnson to arrive. Hawkes wore a shirt with an RPS badge and wore a taser on his belt. Hawkes stood in the only doorway of the

_____

[3] The parties dispute the extent of White's involvement throughout the events of November 6, 2017.

administrator's office, which is a smaller room within the front office. Hawkes, however, never placed his hands on Robertson and never stopped him from leaving the administrator's office.

Once she arrived at the Mary Scott front office, Massenburg-Johnson smelled alcohol as she walked past Robertson. With Robertson, Koger, Hawkes, and White present, Massenburg-Johnson told Robertson about the parent's report that he smelled like alcohol. After Massenburg-Johnson read the Policy to Robertson, he signed it. Robertson then agreed to undergo drug and alcohol testing.

The Policy allows RPS to test an employee "for the presence of alcohol or drugs" when "there is reasonable suspicion[4] . . . that an employee is under the influence and/or using drugs or alcohol in violation of the School Board policy and school division procedures." (*Id.* at 3.) In practice, whenever RPS finds reasonable suspicion that an employee has used alcohol *or* drugs, that employee must undergo testing for alcohol *and* drugs. (*See* Dk. No. 27-7, at 29:1-4, 13-21.) When "[a]n employee . . . refuses to provide an adequate breath sample for alcohol testing," that employee "shall be recommended for termination." (Dk. No. 27-10, at 5.) Similarly, "[a]n employee who refuses to provide an adequate urine sample for drug testing . . . shall be recommended for termination." (*Id.* at 6.)

When Robertson offered to drive himself to Retreat for testing, Hawkes told Robertson that security would escort him to the hospital for the testing. (Dk. No. 27-4, at 51:16-19.) The RPS School Security Officer Standard Operating Procedures allow security officers to "detain[ ] persons violating the law or school board policies on school property." (Dk. No. 27-17, at 2.)

---

[4] The Policy defines "reasonable suspicion" as "suspicion, based upon objective and articulable facts, sufficient to lead a prudent supervisor to suspect that an employee is under the influence of alcohol or drugs. Such objective and articulable facts may include, but are not limited to, impaired motor coordination, smell of alcohol, observed use, possession or sale, frequent tardiness and/or absences, job performance." (Dk. No. 27-10, at 2.)

After arriving at Retreat, Robertson signed a Breath Alcohol Testing Form below the following statement: "I certify that I am about to submit to alcohol testing and that the identifying information provided on this form is true and correct." (Dk. No. 27-11, at 1.) Robertson then took the breath alcohol test, which tested negative for alcohol. Robertson signed a Chain of Custody form for the urinalysis test and an Occupational Health Physical Exam Status Report authorizing the release of the test results to RPS.

Following the alcohol and drug tests, Hawkes took Robertson to City Hall to meet with Williams. Williams put Robertson on administrative leave with pay pending the results of the drug test. Robertson later returned to work after the results of the drug test came back negative.

RPS does not train its employees, including its security officers, on detention, reasonable suspicion, transportation of employees for testing, or what type of testing to administer when RPS suspects that an employee is under the influence of alcohol or drugs.

Robertson's amended complaint asserts the following claims: unreasonable seizure/false arrest in violation of the Fourth Amendment against Massenburg-Johnson, Hawkes, and White, individually (the "individual defendants") (Count One); unreasonable search for drugs in violation of the Fourth Amendment against the individual defendants (Count Two); unreasonable seizure/false arrest in violation of the Fourth Amendment against RPS – custom or usage with the force of law (Count Three); unreasonable seizure/false arrest in violation of the Fourth Amendment against RPS – failure to train (Count Four); unreasonable seizure/false arrest in violation of the Fourth Amendment against RPS – official policy (Count Five); false imprisonment in violation of Virginia law against the individual defendants (Count Six); defamation against Massenburg-Johnson (Count Seven); unreasonable search for drugs in violation of the Fourth Amendment against RPS – custom or usage with the force of law (Count

Eight); and unreasonable search for drugs in violation of the Fourth Amendment against RPS – failure to train (Count Nine).

RPS has moved for summary judgment on all Counts of the amended complaint. Robertson has moved for partial summary judgment on the following Counts: One as to Hawkes only, Two as to Hawkes only, Three, Four, Five, Eight, and Nine.

## II. <u>DISCUSSION</u>[5]

### *A. Fourth Amendment Claims*

Robertson asserts two claims under the Fourth Amendment against the individual defendants: unreasonable seizure in violation of the Fourth Amendment (Count One), and unreasonable search in violation of the Fourth Amendment (Count Two). Robertson also asserts claims against RPS for unreasonable seizure (Counts Three, Four, and Five) and unreasonable search (Counts Eight and Nine) under multiple theories of liability pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

The individual defendants invoke the defense of qualified immunity as to Counts One and Two. Qualified immunity protects government officials from liability under § 1983 arising from the performance of discretionary actions within the scope of their authority. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It applies so long as "their conduct does not violate

---

[5] Rule 56 of the Federal Rules of Civil Procedure directs courts to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a summary judgment motion, the court must draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Nevertheless, if the non-moving party fails to sufficiently establish the existence of an essential element to its claim on which it bears the ultimate burden of proof, the court should enter summary judgment against that party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where parties file cross-motions for summary judgment, courts consider 'each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Capitol Prop. Mgmt. Corp. v. Nationwide Prop. & Cas. Ins. Co.*, 261 F. Supp. 3d 680, 687 (E.D. Va. 2017) (quoting *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392-93 (4th Cir. 2014)).

clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In other words, qualified immunity "gives ample room for mistaken judgments." *Id.* at 343.

The analysis of a qualified immunity defense entails two steps. At the first step, courts decide "whether a constitutional right would have been violated on the facts alleged." *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003). This includes an analysis, based on the evidence, of the specific right allegedly violated, and a conclusion that such a right exists in the particular circumstances of the case. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). At the second step, courts must determine whether, at the time of the violation, the right was clearly established such that a reasonable official in the defendant's position would know that his actions would violate that right. *Simmons v. Poe*, 47 F.3d 1370, 1385 (4th Cir. 1995).

Courts have flexibility in the order in which to perform this analysis. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In this case, the Court will first address whether the individual defendants violated a constitutional right, and if so, whether that right was clearly established at the time of the violation.

### 1. *Unreasonable Seizure*

The Fourth Amendment, made applicable to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[D]rug or alcohol testing of a government employee implicates the Fourth Amendment even though the testing may not be related to enforcement of the criminal law." *Pennington v. Metro. Gov't of Nashville*

& *Davidson Cty.*, 511 F.3d 647, 651 (6th Cir. 2008) (citing *Skinner v. Rwy. Lab. Execs.' Ass'n*, 489 U.S. 602, 616 (1989)).

To impose liability under § 1983 for an unlawful seizure, Robertson must show that he was "(1) unreasonably (2) seized (3) by a government actor." *Monroe v. City of Charlottesville*, 579 F.3d 380, 386 (4th Cir. 2009). A seizure occurs when "a reasonable person [would not] feel . . . free to disregard the officer and terminate the encounter." *Id.* In determining whether a reasonable person would feel free to terminate the encounter, courts consider "all of the circumstances surrounding the encounter." *Id.*

Here, Robertson contends that Hawkes seized him when he submitted to Hawkes' authority in the Mary Scott front office. He argues that "the most important 'custodial' factor is that [he] was threatened with losing his job unless he complied with the order to remain with Hawkes until Hawkes released him." (Dk. No. 29, at 8.) Multiple courts of appeals have rejected that argument, holding that "the possibility or even probability of a future adverse employment action—as opposed to physical detention—cannot enter [the] analysis of whether [public employees] were seized." *Pennington*, 511 F.3d at 652 (quoting *Driebel v. City of Milwaukee*, 298 F.3d 622, 642 (6th Cir. 2008)).[6] Instead, an employee "is seized if a reasonable person in [the employee's] position would believe that he were not actually free to disobey the

---

[6] *Accord Carter v. City of Milwaukee*, 743 F.3d 540, 544 (7th Cir. 2014) ("[T]he potential for work-related discipline is not sufficient to succeed on a Fourth Amendment claim."); *Aguilera v. Baca*, 510 F.3d 1161, 1169 (9th Cir. 2007) ("[T]he Fourth Amendment does not protect against the threat of demotions or job loss[;] the relevant constitutional inquiry is whether a reasonable [person] in the position of the plaintiff[ ] would have feared detention if he refused to obey the commands of [the officer]."); *Fierson v. District of Columbia*, 506 F.3d 1063, 1067 (D.C. Cir. 2007) ("The relevant inquiry is whether a reasonable person would have believed he would be detained if he disobeyed his supervisor's order—not whether he feared negative consequences for his job."); *Reyes v. Maschmeier*, 446 F.3d 1199, 1204 (11th Cir. 2006) ("[A] claim that a government supervisor has seized a public employee in violation of the Fourth Amendment must allege circumstances that implicate more than obligations that arise from the employment relationship.").

command—that is, if he feared he would be detained if he attempted to leave." *Gwynn*, 719 F.3d at 300.

For example, in *Gwynn*, two police officers alleged that their superiors unreasonably seized them in violation of the Fourth Amendment. *Id.* at 297. After being accused of stealing money during a stop and frisk, the officers' superiors ordered them to wait for representatives from the Internal Affairs Bureau to arrive. The superior officers prevented the officers from using their cell phones, questioned them about the stop and frisk, ordered them to pull out their pockets and pant legs, and forced them to open their wallets. The Third Circuit held that the officers complied with their superiors' orders because "they feared 'discipline and possible loss of employment' if they disobeyed." *Id.* at 297-98. Accordingly, "to the extent [the officers] felt compelled to obey their superior officers' commands, that compulsion was borne out of their employment relationship." *Id.* at 302. The court further noted that "the circumstances surrounding the investigation were not particularly coercive" and that the officers "admitted . . . that they followed the orders of their superior officers because they were concerned that they would suffer work-related consequences if they did not do so." *Id.*

Similarly, the Sixth Circuit in *Pennington* rejected an off-duty police officer's seizure claim, holding that the officer "was not seized when he submitted to [a] breathalyzer test." 511 F.3d at 652. The officer's supervisor ordered him to take a breathalyzer test after the officer had been in a bar fight in which he identified himself as a police officer. The court held that no seizure occurred, reasoning that the officer "was afraid that he would lose his job or suffer disciplinary action if he failed to submit to the breathalyzer test, and he agreed to the test for that reason." *Id.* Moreover, the officer "was not handcuffed, he was not placed in the back seat of

the police car, he was not read his *Miranda* rights, and he was allowed to return home without filing his report of the incident." *Id.*

In this case, Robertson agreed to undergo drug and alcohol testing because he "w[as] concerned that [he] would suffer work-related consequences if [he] did not do so." 719 F.3d at 302. (*See* Dk. No. 27-2, at 100:4-10 ("So that's why I . . . decided to take it, because I didn't want to lose my job.").) Because the Court cannot factor "the possibility or even probability of a future adverse employment action" into the Fourth Amendment seizure analysis, *Pennington*, 511 F.3d at 652, the Court must determine whether "a reasonable person in [Robertson's] position would believe that . . . he would be detained if he attempted to leave," *Gwynn*, 719 F.3d at 300.

Robertson points to additional facts aside from his fear of losing his job to show that he was not free to leave. He notes that Hawkes stood in the only doorway of the administrator's office, wore an RPS shirt and had a taser on his belt, and followed him to a classroom so that Robertson could pick up his lunch. Hawkes, however, never placed his hands on Robertson and never stopped Robertson from leaving the administrator's office. Hawkes neither put Robertson in handcuffs nor told him that he was the subject of a criminal investigation. Because the circumstances surrounding the alleged seizure in this case "were not particularly coercive," *id.* at 302, a reasonable person in Robertson's position would not have feared detention if he tried to leave.[7]

---

[7] In contrast, the defendants in *Cerrone v. Brown*, 246 F.3d 194, 198 (2d Cir. 2001), conceded that their actions amounted to a seizure when they "asked [the plaintiff] whether he was carrying a weapon, allegedly placed him in the felony position, placed him in the back of an unmarked police car (where he was guarded), transported him to a hotel room, read him his *Miranda* rights, and informed him that he was the target of a criminal investigation."

Indeed, the evidence shows that Robertson "did not believe that he would be forcibly detained if he attempted to leave; rather he claimed he was 'compelled by the threat of job loss' to comply." *Id.* at 301 (quoting *Pennington*, 511 F.3d at 652). And because "[a] person is not seized simply because he believe[d] that he w[ould] lose his job," *Pennington*, 511 F.3d at 652, Robertson's § 1983 seizure claim against the individual defendants must fail. Accordingly, the Court will grant the defendants' motion for summary judgment on Count One.

Robertson also asserts three claims against RPS based on the alleged unconstitutional seizure. "In order to prevail on a *Monell* claim involving unconstitutional customs or practices, a plaintiff must first show an underlying constitutional violation by an employee or agent of the defendant entity." *Doe ex rel. Lopez v. Shenandoah Valley Juvenile Ctr. Comm'n*, 355 F. Supp. 3d 454, 465 (W.D. Va. 2018). Because Robertson cannot show an underlying constitutional violation for the alleged unlawful seizure, his seizure claims against RPS under *Monell* also must fail. *See S.P. v. City of Takoma Park*, 134 F.3d 260, 272 (4th Cir. 1998). The Court, therefore, will grant the defendants' motion for summary judgment on Counts Three, Four, and Five.

Finally, Robertson asserts a false imprisonment claim under Virginia law against the individual defendants. Virginia law defines false imprisonment as "the direct restraint by one person of the physical liberty of another without adequate legal justification." *Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009). A plaintiff must show "that he has been illegally detained without lawful process." *Montgomery Ward & Co. v. Wickline*, 188 Va. 485, 50 S.E.2d 387, 389 (1948). Because Robertson cannot show that he suffered any unlawful seizure, his state law false imprisonment claim cannot succeed. *See King v. Darden*, No. 3:17-cv-742, 2019 WL 1756531, at *5 (E.D. Va. Apr. 19, 2019), *appeal filed*, No. 19-1551 (4th Cir. May 22, 2019) ("Nearly identical principles govern claims for false arrest under the Fourth Amendment and for false

imprisonment under Virginia law.").[8]  Accordingly, the Court will grant the defendants' motion for summary judgment on Count Six.

### 2. *Unreasonable Search*

### a. *Claim Under § 1983*

### i. *Constitutional Right*

"It is well established that a drug test, be it a urinalysis test or blood test, is a 'search' within the meaning of the Fourth Amendment." *Hassell v. City of Chesapeake*, 64 F. Supp. 2d 573, 576 (E.D. Va. 1999).  The Fourth Amendment, however, prohibits only unreasonable searches. *See Chandler v. Miller*, 520 U.S. 305, 313 (1997).  Courts conduct a "twofold inquiry" to evaluate the reasonableness of a search. *O'Connor v. Ortega*, 480 U.S. 709, 726 (1987).  First, courts consider whether the search "was justified at its inception." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).  Second, courts determine whether the search "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985)).

A drug test "will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct." *Stone v. City of Seneca*, No. 8:07-3401-HFF, 2009 WL 8755605, at *7 (D.S.C. May 14, 2009), *aff'd*, 378 F. App'x 356 (4th Cir. 2010) (quoting *O'Connor*, 480 U.S. at 726).

The defendants decided to administer the drug test based on the following evidence: (1) a report from a parent that Robertson was "drunk or smell[ed] like he [had been] drinking," (Dk.

---

[8] *See also Fuller v. Carilion Clinic*, 382 F. Supp. 3d 475, 505 (W.D. Va. 2019) (denying a motion for summary judgment on the plaintiff's false imprisonment claim under Virginia law when "there [was] sufficient evidence for a reasonable jury to find that [the defendant] violated [the plaintiff's] right to be free from unreasonable seizures for purposes of his claim under § 1983").

No. 19, at 13:1-9), and (2) Koger's observation of Robertson stumbling while interacting with students. While those reports suggest alcohol use,[9] nobody reported any behavior consistent with drug use. Notwithstanding the lack of any reasonable suspicion of drug use, the defendants contend that "there was reasonable suspicion to test Robertson for mind-altering substances." (Dk. No. 34, at 11.) Essentially, the defendants argue that reasonable suspicion of alcohol use gave them open license to test Robertson for any substances that might have altered his cognition.

The Court cannot endorse such a broad interpretation of the reasonable suspicion standard. To be sure, a public employer may test an employee for alcohol with reasonable suspicion of alcohol use. And a public employer may test an employee for drugs with reasonable suspicion of drug use. *See Stone*, 2009 WL 8755605, at *7 (finding reasonable suspicion to test for alcohol following reports that the employee "reeked of alcohol); *Hassell*, 64 F. Supp. 2d at 576 (finding reasonable suspicion to test for drugs when co-workers "smelled the odor of marijuana" on the employee). Reasonable suspicion that an employee has used one substance, however, does not give a public employer an unlimited right to search that employee for all "mind-altering substances."[10]

_____

[9] Because Robertson concedes that the defendants had reasonable grounds for suspecting alcohol use, he does not challenge the constitutionality of the breathalyzer.

[10] Relying on *Hassell*, the defendants argue that Robertson holds a "highly sensitive position" as a preschool teacher's aide, so "the evidentiary standard necessary to establish reasonable suspicion to order a drug test . . . is a lesser standard than that necessary to test an employee in a less sensitive position." 64 F. Supp. 2d at 577. Courts must judge the reasonableness of a search by balancing "its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner*, 489 U.S. at 619. The defendants, of course, have a legitimate interest in ensuring that RPS instructional staff do not abuse substances and do not report to work in a mentally impaired state. But no matter how low an evidentiary standard the Court applies to determine reasonable suspicion or how legitimate the governmental interest at stake, the defendants still needed some reasonable suspicion *of drug use*. The defendants had no

The Fourth Circuit's decision in *Roberts v. City of Newport News*, No. 93-2327, 1994 WL 520948 (4th Cir. Sept. 23, 1994) (per curiam), supports this conclusion. In that case, the court held that "a government employer may require an employee to submit to urinalysis where the employer has reasonable, articulable grounds to suspect an employee of illegal drug involvement." *Id.* at *2. Demanding a urinalysis "require[s] individualized suspicion, specifically directed to the person who is targeted for the urinalysis test." *Id.*; *see also Rodriguez v. City of Chicago*, 370 F. Supp. 3d 848, 858 (N.D. Ill. 2019) ("Multiple courts of appeals have upheld warrantless drug testing when a government employer has 'reasonable, articulable grounds to suspect an employee of illegal drug involvement.'" (quoting *Ford v. Dowd*, 931 F.2d 1286, 1289 (8th Cir. 1991)). Because the defendants lacked any individualized suspicion of drug use directed at Robertson, the urinalysis was not justified at its inception.

Nor was the search "reasonably related in scope to the circumstances which justified the interference in the first place." *Stone*, 2009 WL 8755605, at *7 (quoting *O'Connor*, 480 U.S. at 726). To be permissible in scope, a search must be "reasonably related to the objectives of the search and not excessively intrusive in light of . . . the nature of the [misconduct]." *Id.* (alteration in original). The "nature of the misconduct" here involved allegations that Robertson came to work smelling like alcohol and was stumbling while interacting with students.

The defendants responded to that alleged misconduct in an unreasonable manner. A measured response would have been to simply administer a breathalyzer, "the least intrusive way of testing" for alcohol. *United States v. Reid*, 929 F.2d 990, 994 (4th Cir. 1991). But the defendants went a step further with the urinalysis test. And a urinalysis "is a particularly invasive" search, "because drug testing, especially by urinalysis, intimately involves an

_____

individualized suspicion of drug use, so they cannot rely on a "lesser standard," *Hassell*, 64 F. Supp. 2d at 577, to get around the reasonable suspicion requirement altogether.

individual's privacy and bodily integrity." *Am. Fed'n of Teachers-W. Va., AFL-CIO v. Kanawha Cty. Bd. of Educ.*, 592 F. Supp. 2d 883, 892 (S.D. W. Va. 2009); *see also Skinner*, 489 U.S. at 617 ("There are few activities in our society more personal or private than the passing of urine."). Considering the lack of any individualized suspicion of drug use and the intrusiveness of the search, the urinalysis test was not reasonably related in scope to the circumstances justifying the search in the first place.[11]

Because the urinalysis test fails both prongs of the reasonableness inquiry, Robertson has shown a violation of his constitutional right against unreasonable searches. *See Saucier*, 553 U.S. at 200. The defendants point to two exceptions to the Fourth Amendment's prohibition against unreasonable searches, neither of which justifies the urinalysis test.

First, the defendants invoke the "special needs" exception. That exception, however, applies when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 830 (2002). In other words, the special needs exception applies "[i]n limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion." *Skinner*, 489 U.S. at 624.

---

[11] The defendants argue that RPS tests for alcohol and drugs "because RPS has no way of knowing what substance the employee may be under the influence of." (Dk. No. 27, at 9.) But neither the parent (who reported that Robertson smelled like alcohol) nor Koger (who saw Robertson stumbling) had any difficulty identifying what substance they thought Robertson had used. Massenburg-Johnson testified that she "received a call that there was a possibility [Robertson] had been drinking." (Dk. No. 27-3, at 19:8-10.) Koger testified that a parent told her that Robertson was "drunk or smell[ed] like he [had] been drinking." (Dk. No. 27-19, at 4-6.) Nobody thought that Robertson had used drugs. Thus, the evidence contradicts the defendants' argument that RPS cannot tell whether a person has used alcohol or drugs.

In this case, Williams first made a reasonable suspicion finding under the Policy, which the defendants then relied on to justify the urinalysis test. The defendants, therefore, did not search Robertson pursuant to a "programmatic search" in which an "element of surprise [was] necessary to achiev[e] the purpose of the search." *Ascolese v. Se. Pa. Transp. Auth.*, 902 F. Supp. 533, 551 (E.D. Pa. 1995); *see United States v. Curry*, 937 F.3d 363, 379 (4th Cir. 2019) (Floyd, J., dissenting) ("In all special needs cases, the lynchpin of the court's inquiry is whether it is impracticable to require [reasonable suspicion] in light of the primary purpose of a programmatic search."). Thus, the defendants do not and cannot argue that they searched Robertson because the circumstances surrounding the search "render[ed] adherence to the [reasonable suspicion] requirement[ ] impracticable." *Id.*

Second, the defendants argue that Robertson consented to the search, pointing to the various forms he completed authorizing the hospital to release the results of the drug test to RPS. "Although a 'search conducted pursuant to a valid consent is constitutionally permissible, . . . consent must be 'in fact voluntarily given, and not the result of duress or coercion, express or implied.'" *Am. Fed'n of State, Cty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 873-74 (11th Cir. 2013) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973)). Because RPS recommends termination when an employee refuses urinalysis testing, Robertson had to choose between losing his job or submitting to the urinalysis test. That choice was not a choice at all.

In *Scott*, the Eleventh Circuit rejected the argument the defendants advance here, holding that "employees' submission to drug testing, on pain of termination, [does not] constitute[ ] consent under governing Supreme Court case law." *Id.* The court reasoned that "[e]mployees who must submit to a drug test or be fired are hardly acting voluntarily, free of either express or implied duress and coercion." *Id.* at 874. *Scott* teaches that a public employer cannot force an

employee to choose between losing his job or submitting to an intrusive drug test. Accordingly, to the extent that Robertson consented to the urinalysis testing, he did so only "because [he] feared [he] would lose [his] job[ ]." *Bostic v. McClendon*, 650 F. Supp. 245, 249 (N.D. Ga. 1986) (holding that the plaintiffs did not voluntarily consent to urinalysis testing). Robertson, therefore, did not voluntarily consent to the urinalysis test.[12]

Because the urinalysis test amounts to an unconstitutional search, the Court next considers whether the individual defendants violated clearly established law.

### ii. *Clearly Established Law*

In analyzing the second step of the qualified immunity analysis, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Layne*, 526 U.S. at 615 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Defining the right requires "a high level of particularity." *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999). In considering whether a right is clearly established, "the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose." *Wilson v. Kittoe*, 337 F.3d 392, 402-03 (4th Cir. 2003). While the second step in a qualified immunity analysis "do[es] not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). In other words, at the time of the official's

---

[12] The defendants argue that "[f]or the same reasons Robertson was not seized simply because he feared losing his job, Robertson's consent to be tested was not coerced just because he chose testing over the risk of being terminated." (Dk. No. 32, at 11.) The defendants erroneously conflate the seizure inquiry with the analysis governing voluntary consent to a search. The seizure inquiry turns on whether a reasonable person in Robertson's position would have felt free to leave, not whether that person would have feared losing his job. By contrast, the urinalysis test unquestionably qualifies as a search. Thus, the issue is not whether the urinalysis test amounts to a search, but whether Robertson voluntarily consented to that search. Although fear of job loss alone does not create a seizure, it does negate the voluntariness of consent to an intrusive search.

actions, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640.

The urinalysis test violated the Fourth Amendment's prohibition against unreasonable searches. Whether the defendants violated a clearly established right, however, presents a more difficult question. To be sure, drug searches "require individualized suspicion, specifically directed to the person who is targeted for the urinalysis test." *Roberts*, 1994 WL 520948, at *2. But the Court must consider "the specific context of the case," not whether the individual defendants violated a right "as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2016). Thus, the relevant inquiry is whether the individual defendants could have believed that their actions were lawful, "in light of clearly established law and the information the [defendants] possessed." *Layne*, 526 U.S. at 615.

Here, the defendants administered the urinalysis test at Williams' direction following reasonable suspicion of alcohol use. Although the urinalysis offended the Fourth Amendment, the Court cannot "identify a case where an [official] acting under similar circumstances as [the individual defendants] was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). Because the decision to administer the urinalysis test at Williams' direction after reasonable suspicion of alcohol use was a "bad guess[ ] in [a] gray area[ ]," *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992), qualified immunity shields the individual defendants from liability. Accordingly, the Court will grant summary judgment for the individual defendants on Count Two.

### b. Claims Against RPS

In Counts Eight and Nine, Robertson seeks to hold RPS liable for the unconstitutional search, challenging RPS' policy to test employees for alcohol *and* drugs based on reasonable

suspicion of alcohol *or* drugs and its failure to train its employees.  Local governmental entities qualify as "persons" under § 1983, and plaintiffs may sue them directly for constitutional violations.  *Monell*, 436 U.S. at 690.  Municipalities, however, face liability only when their agents inflict a constitutional injury while executing the local government's policy or custom. *Id.* at 694.  In other words, a plaintiff must show that "the municipality *itself* cause[d] the constitutional violation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  Thus, municipalities do not bear liability for the constitutional torts of their employees under the doctrine of respondeat superior.  *Monell*, 436 U.S. at 691.  Moreover, liability will not attach when one employee "happen[s] to apply the policy in an unconstitutional manner."  *City of Canton*, 489 U.S. at 387.

"All § 1983 *Monell* claims have three elements: '(1) identifying the specific 'policy' or 'custom'[;] (2) fairly attributing the policy and fault for its creation to the municipality; and (3) finding the necessary 'affirmative link' between identified policy or custom and specific violation."  *Peprah v. Williams*, No. GLR-18-990, 2019 WL 224245, at *5 (D. Md. Jan. 15, 2019) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987)).  Regarding the first element, the "policy" or "custom" here is RPS' practice to test for alcohol *and* drugs following any reasonable suspicion determination of alcohol *or* drugs.

Robertson proceeds on two theories to hold RPS liable: (1) that RPS' practice amounts to a "custom or usage with the force of law" in Count Eight, and (2) that RPS failed to train its employees in Count Nine.  "Because the 'deficient training policy' and 'condoned custom' theories are simply alternative ways of establishing municipal fault, hence potential *Monell* liability, for specific constitutional violations by [officials], they may be asserted as alternative theories in particular litigation."  *Spell*, 824 F.2d at 1391.  The Court will consider each in turn.

## i. *Custom or Usage with the Force of Law*

A governmental custom "may arise if a practice is so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Municipal fault for allowing such a developed 'custom or usage' to continue requires (1) actual or constructive knowledge of its existence by responsible policymakers, and (2) their failure, as a matter of specific intent or deliberate indifference, thereafter to correct or stop the practices." *Spell*, 824 F.2d at 1391. "Both knowledge and indifference can be inferred from the 'extent' of employees' misconduct." *Owens v. Balt. City State's Attorneys' Office*, 767 F.3d 379, 402-03 (4th Cir. 2014) (quoting *Spell*, 824 F.2d at 1391). "Sporadic or isolated violations of rights will not give rise to *Monell* liability: only 'widespread or flagrant' violations will." *Id.* (quoting *Spell*, 824 F.2d at 1387).

Here, Williams testified—and RPS admits—that RPS tests for "substances" following reasonable suspicion of alcohol *or* drug use. (*See* Dk. No. 27-7, at 39:22-40:5.) Williams carried out that policy when he determined that reasonable suspicion existed to test Robertson for alcohol and drugs based on reports consistent only with alcohol use. Robertson argues that the "extent" of RPS' practice to test for substances generally shows RPS' constructive knowledge and indifference.[13] To show the widespread extent of the practice, Robertson relies on an RPS document, which indicates "that within the two years immediately preceding [November 6, 2017] there had been 11 people referred for . . . reasonable suspicion drug and alcohol testing."

---

[13] "To establish constructive knowledge, a plaintiff can show any combination of [the following]: the widespread extent of the practices, general knowledge of their existence, or an official action of responsible policymakers." *November v. Chesterfield Cty.*, No. 3:17-cv-113-JAG, 2017 WL 4922017, at *4 (E.D. Va. Oct. 31, 2017). Robertson does not argue that Williams is a final policymaker for *Monell* purposes. Thus, the Court understands Robertson to argue that RPS has constructive knowledge of the unconstitutional policy based on the widespread extent of the practice.

(Dk. No. 27-7, at 38:20-40:4.) Williams agreed that "it would be a fair inference . . . that all 11 people referred for testing . . . were subjected to both drug and alcohol tests." (*Id.* at 40:6-10.)

The Court, however, remains in the dark as to the context surrounding the eleven prior incidents. Robertson may ultimately prevail at trial by proving that the prior incidents "demontrat[e] that the unlawful practice [is] so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Gaddy v. Yelton*, No. 1:10-cv-214, 2011 WL 3608023, at *5 (W.D.N.C. Aug. 16, 2011). On the current record, however, the Court cannot determine as a matter of law whether the prior incidents give rise to *Monell* liability. Accordingly, the Court finds summary judgment for neither party appropriate on Robertson's "custom or usage" claim against RPS.[14] *See Livingston v. Kehagias*, No. 5:16-cv-906-BO, 2018 WL 3398113, at *17 (E.D.N.C. July 12, 2018), *appeal filed*, No. 18-1906 (4th Cir. Aug. 9, 2018) (allowing the plaintiffs' *Monell* claims to proceed when the plaintiffs "presented, in addition to statistics, five incidents which occurred within one calendar year"). The Court, therefore, will deny the parties' cross-motions for summary judgment on Count Eight.

## ii. *Failure to Train*

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights" may constitute "policy" pursuant to *Monell*. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To recover under this "tenuous" theory of liability, *id.*, "a plaintiff must plead and prove that: (1) the [local government] subordinates actually violated the plaintiff's constitutional or statutory rights; (2) the [local government] failed

---

[14] "When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal citations and quotation marks omitted).

to train properly the subordinates thus illustrating a 'deliberate indifference' to the rights of the persons with whom the subordinates come into contact; and (3) this failure to train actually caused the subordinates to violate the plaintiff's rights." *Brown v. Mitchell*, 308 F. Supp. 2d 682, 701 (E.D. Va. 2004).[15]

The deliberate indifference element creates "a stringent standard of fault," *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997), and a plaintiff must identify a "specific deficiency rather than general laxness or ineffectiveness in training." *Spell*, 824 F.2d at 1390. Furthermore, a plaintiff must show that the municipality disregarded a known or obvious consequence of its decision. *Brown*, 520 U.S. at 410. A plaintiff can prove deliberate indifference by showing that policymakers knew about and acquiesced in "a pattern of constitutional violations." *Mitchell*, 308 F. Supp. 2d at 704. Alternatively, a plaintiff can show failure to train employees about an "obvious constitutional duty that the particular employees are certain to face." *Id.* To impose liability under the latter method, a plaintiff must establish that "the underlying constitutional right is quite clear and is one that the subordinates reasonably can be expected to confront with some regularity." *Id.* at 705-06. "Ordinarily, a pattern of similar constitutional violations by untrained employees is necessary to show deliberate indifference in a failure to train case." *McCarthy v. City of Charlotte*, No. 3:12-cv-838, 2013 WL 5525745, at *11 (W.D.N.C. Aug. 2, 2013).

Here, RPS concedes that it does not train its employees "on topics concerning detention, reasonable suspicion, . . . or what testing should be administered." (Dk. No. 27, at 9.) In light of

---

[15] As the Court explained above, the urinalysis amounted to a violation of Robertson's Fourth Amendment right against unreasonable searches. Thus, Robertson has shown that RPS subordinates actually violated his constitutional rights. Although the parties dispute the extent to which the three individual defendants were involved in the decision to administer the urinalysis, the parties agree that Hawkes transported Robertson to the hospital for the breathalyzer and urinalysis test.

the lack of training, Robertson argues that the eleven prior incidents amount to "a pattern of constitutional violations" and that RPS employees can be expected to confront issues regarding reasonable suspicion testing with regularity. This litigation thus differs from cases in which "proof of a single violation [do] not support the inference that the violation resulted from a municipal 'policy' of deficient training." *Spell*, 824 F.2d at 1391. Robertson has raised a triable issue as to the existence of "a pattern of similar constitutional violations by untrained employees." *McCarthy*, 2013 WL 5525745, at *12. A reasonable jury could find the constitutional violation "almost bound to happen, sooner or later" due to the deficiency in training. *Id.* Accordingly, the Court will deny the parties' cross-motions for summary judgment on Count Nine.

### B. Defamation

In Count Seven, Robertson asserts a defamation claim against Massenburg-Johnson. Robertson says that Massenburg-Johnson defamed him when she reiterated the parent's report that he smelled like alcohol and read the Policy aloud to Robertson in the front office. "To succeed on a defamation claim under Virginia law, Robertson must prove "(1) publication of (2) an actionable false statement with (3) the requisite intent." *Jordan v. Kollman*, 269 Va. 569, 612 S.E.2d 203, 206 (2005). "To be actionable, the statement must be both false and defamatory." *Id.* Robertson has failed to demonstrate that Massenburg-Johnson made an actionable false statement. Massenburg-Johnson said that a parent reported that Robertson smelled like alcohol. Because a parent had in fact made such a report, Robertson cannot show that Massenburg-Johnson's statement was false.

Robertson also alleges defamation per se. He says that "[e]ven if Massenburg-Johnson's statements were facially true, if they carr[ied] with them innuendo designed [to] injure Robertson

in his profession, they are defamatory per se." (Dk. No. 33, at 24.) Robertson misstates Virginia law. "[A] plaintiff seeking to recover for defamation per se must allege a publication of *false* information concerning the plaintiff that tends to defame the plaintiff's reputation." *Hatfill v. N.Y. Times Co.*, 416 F.3d 320, 330 (4th Cir. 2005) (emphasis added). Because Robertson has failed to show that Massenburg-Johnson made any false statement, his defamation per se claim must fail.[16] Accordingly, the Court will grant summary judgment for Massenburg-Johnson on Count Seven.

### III. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the parties' cross-motions for summary judgment. The Court will grant summary judgment for the defendants on Counts One through Seven. The Court, however, will deny the parties' cross-motions for summary judgment on Counts Eight and Nine. This case will proceed only as to Counts Eight and Nine against RPS.

---

[16] Robertson's amended complaint specifically alleges defamation per se, (Dk. No. 22, at ¶ 140), and he repeatedly argues in his opposition brief that Massenburg-Johnson's statements qualify as defamation per se, (Dk. No. 33, at 24). To the extent that Robertson intends to assert a claim for defamation by implication, that claim would also fail. To succeed on a claim for defamation by implication, a plaintiff must show: "(1) that the defendants made the statements alleged in the complaint, (2) that the statements, even if facially true, were designed and intended by the defendants to imply [the defamatory meaning], (3) that in the light of the circumstances prevailing at the time they were made, the statements conveyed that defamatory implication to those who heard or read them, and (4) that the plaintiff suffered harm as a result." *Edwards v. Schwartz*, 378 F. Supp. 3d 468, 504 (W.D. Va. 2019). A court must first decide "(1) whether a statement has a provably false factual connotation and (2) whether a statement is capable of having a defamatory meaning injurious to the plaintiff's reputation." *Id.* "Where, as here, a plaintiff alleges that he has been defamed not by statements of fact that are literally true but by an implication arising from them, the alleged implication must be reasonably drawn from the words actually used." *Webb v. Virginian-Pilot Media Cos.*, 287 Va. 84, 752 S.E.2d 808, 811 (2014). Here, Robertson argues that Massenburg-Johnson's statement about the parent's report that Robertson smelled like alcohol "coupled with reading him the entire Policy, carried the innuendo that Robertson had been drinking or was drunk on the job." (Dk. No. 33, at 24.) Even if Robertson had properly alleged defamation by implication, Massenburg-Johnson's statements, when viewed in context, do not meet the standard.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 4 November 2019 2019
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge